UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UTHA HELLMANN-BLUMBERG,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSITY OF THE PACIFIC,<br><br>Defendant. | No.  2:12-cv-00286 TLN DAD<br><br><br><br>**ORDER** |

This matter is before the Court pursuant to Defendant University of the Pacific's ("Defendant") Motion for Summary Judgment or in the Alternative Partial Summary Judgment (ECF No. 65).[1]  Plaintiff Utha Hellman-Blumberg ("Plaintiff") opposes Defendant's motion. (Pl.'s Mem. P.&A. Opp'n Def.'s Mot. Summ. J., ECF No. 87.)  The Court has reviewed the parties' filings in this matter and for the reasons stated below Defendant's motion for summary judgment (ECF No. 65) is hereby DENIED.

**I.     FACTUAL AND PROCEDURAL BACKGROUND**

In 2001, Plaintiff was hired as a tenure track assistant professor in University of the Pacific's Chemistry Department.  (Pl.'s Verified Compl., ECF No. 1, Ex. A at 13.)  During the 2006–2007 academic year, Plaintiff sought promotion and appointment with tenure.  (ECF No. 1

---

[1]  The pagination citations in this order for all ECF citations refer to the ECF docket page number referenced at the top of the filed documents.

1    at ¶ 12.)  In a letter dated April 15, 2007, Donald DeRosa, President of University of the Pacific,
2    denied Plaintiff's request for tenure and promotion.  (ECF No. 1 at ¶ 16.)  On August 31, 2008,
3    Defendant terminated Plaintiff's employment.  (ECF No. 1 at ¶ 17.)  On December 5, 2007,
4    Plaintiff filed a charge of sex discrimination against Defendant with the United States Equal
5    Employment Opportunity Commission (EEOC), and the California Department of Fair
6    Employment & Housing (DFEH).  (ECF No. 1 at ¶ 21.)  On November 15, 2011, the United
7    States Department of Justice issued Plaintiff a Notice of Right to Sue after Plaintiff had exhausted
8    her administrative remedies.  (ECF No. 1 at ¶ 22.)  In addition, the DFEH issued a right to sue
9    letter.  (ECF No. 1 at ¶ 22.)

10           Plaintiff filed a Complaint with this Court on February 2, 2012, alleging:
11   (1) discrimination on the basis of sex in violation of 42 U.S.C. § 2000e-2(a); (2) discrimination on
12   the basis of sex and gender in violation of California Government Code § 12940; (3) failure to
13   prevent discrimination in violation of California Government Code § 12940(k); (4) breach of
14   contract; and (5) breach of covenant of good faith and fair dealing.  (ECF No. 1.)

15           Defendant has filed a summary judgment motion asserting that Plaintiff's first,
16   second and third claims fail as a matter of law because Plaintiff "cannot establish one and/or two
17   of the four elements of her prima facie case: qualification for tenure, and more favorable
18   treatment for similarly-situated males."  (Def's P.&A. in Supp. of Summ. J., ECF No. 70 at 21–
19   22.)  Additionally, Defendant contends that it has a legitimate, non-discriminatory reason for
20   discontinuing Plaintiff's employment.  (ECF No. 70 at 23.)  Defendant further asserts that
21   Plaintiff's fourth and fifth claims fail as a matter of law because California law does not provide a
22   cause of action for breach of contract  or breach of implied covenant of good faith and fair
23   dealing arising from the denial or loss of tenure at a private university.  (ECF No. 70 at 24.)

24   **II.    LEGAL STANDARD**

25           Summary judgment is appropriate when the moving party demonstrates no
26   genuine issue as to any material fact exists, and therefore, the moving party is entitled to
27   judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144,
28   157 (1970).  Under summary judgment practice, the moving party always bears the initial

responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotations omitted). Indeed, summary judgment should be entered against a party who does not make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585−87 (1986); *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288−289 (1968). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 251−52.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank*, 391 U.S. at 288−89. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with any applicable affidavits. Fed. R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305−06 (9th Cir. 1982). The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244−45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987). Finally, to demonstrate a genuine issue that necessitates a jury trial, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* at 587 (internal quotations omitted).

### III.  ANALYSIS

Plaintiff's first three claims are based on alleged discrimination. The fourth and fifth claims are both contract claims based entirely on California law. As such, the Court addresses the first three claims together and subsequently addresses the fourth and fifth claims.

#### A.  Plaintiff's Gender/Sex Discrimination Claims

California has adopted the three-stage burden-shifting test established by the United States Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 801–804 (1973), for trying employment cases, including claims of discrimination based on a theory of disparate treatment under the California Fair Employment and Housing Act (FEHA). *See Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 354 (2000). Pursuant to the *McDonnell Douglas* framework, a plaintiff is required to meet the following four criteria in order to establish a prima facie case of gender discrimination: (1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably. *McDonnell Douglas*, 411 U.S. at 802.

The *McDonnell Douglas* test places the initial burden on the plaintiff in an effort

to eliminate at the outset the most patently meritless claims. *Guz*, 24 Cal. 4th at 354. "While the plaintiff's prima facie burden is not onerous, he must at least show actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a prohibited discriminatory criterion." *Id.* at 355 (internal quotations and citations omitted); *see also Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981). "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dept. of Community Affairs*, 450 U.S. at 254. The burden then shifts to the defendant to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected or someone else was preferred, for a legitimate nondiscriminatory reason. *Id.* The burden is then shifted back to the plaintiff to establish that the employer's articulated reason was a "pretext" or a cover-up for unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 802–804. While a satisfactory evidentiary explanation by the employer for its actions destroys the legally mandatory inference of discrimination arising from the plaintiff's prima facie case, the evidence and inferences that properly can be drawn from the prima facie case may be considered in determining whether the employer's explanation is pretextual. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993).

        **i.**     **Prima Facie Case**

Defendant asserts that Plaintiff cannot meet two of the four elements required to show a prima facie case: qualifications for tenure and more favorable treatment for similarly-situated males. (ECF No. 70 at 21–22.) Defendant's tenure guidelines set forth the following criteria for a professor to be granted tenure:

> As a University-wide criterion in evaluations for promotion and appointment with tenure, a sustained record demonstrating high quality teaching in the areas of academic responsibility is most important. A sustained record demonstrating high quality scholarship or artistic achievements in the field of academic appointment is next in importance. Relevant University and professional service is expected of all faculty. While teaching and scholarship are weighted higher in promotion and tenure decisions, University and professional service is required and will be evaluated according to unit guidelines and the professorial rank being considered. Evaluation should emphasize quality, and

5

> quantity shall not be evaluated with an emphasis equivalent to or greater than quality. Further, a report of potential for high quality teaching, high quality scholarly or artistic achievements, and relevant University and professional service, without a demonstration that these elements are present at a level relevant to the evaluation, in the judgment of the reviewers, is not sufficient to sustain a favorable recommendation. Consideration of citizenship in the University is part of the established evaluation areas of teaching, scholarship or artistic performance, and service and is not to be evaluated as a separate area. Such consideration should not be used to discriminate on any basis prohibited by the University's Policy on Academic Freedom (Section 3.1) and should not be used to promote orthodoxy of opinion on academic matters.

(Univ. of the Pacific Faculty Handbook, Adopted June 2002, Section 7.5.4 Evaluation Criteria, ECF No. 69-1 at 15–16.) Additionally, Defendant's Faculty Handbook provides that the President holds the authority to grant promotions and make appointments with tenure based on his or her judgment that the standards for promotion and appointment have been satisfied. (Section 7.4.7, ECF No. 69-1 at 13.)

The crux of the question is whether a single publication is sufficient to establish a "sustained record demonstrating high quality teaching in the areas of academic responsibility," as required by the tenure guidelines. Plaintiff asserts that she met the qualifications and provides positive recommendations for her tenure as evidence of such. (*See* Evaluation Committee's Report, ECF No. 69-13; Tenure and Promotion Evaluation of Dr. Uta Hellmann- Blumberg, Chair's Report, ECF No. 69-14; Letter to Silvio Rodriquez from Dr. Gregg Jongeward, ECF No. 86-1 at 22–25; Univ. of Pacfic's Promotion and Tenure Committee's vote in favor of granting Pl. tenure, at Jose Fuentes Decl. Exhibits 18 and 19, ECF Nos. 92-3, 92-4.) In addition, Plaintiff contends that two male professors–Dr. Michael McCallum and Dr. Mark Brunell–had the same or fewer publications than she had at the time of her tenure application and were granted tenure. (ECF No. 87 at 24.) Plaintiff asserts that these facts support her contention that she in fact meets the criteria for tenure and further demonstrate more favorable treatment for similarly-situated males.

In response, Defendant argues that Dr. McCallum and Dr. Brunell are not similarly situated. (Def.'s Reply in Supp of Summ. J., ECF No. 101 at 12.) Specifically, as to Dr.

McCallum, Defendant argues that he is not similarly situated because his tenure decision was made in 1999 and, as such, a different tenure standard was employed at that time. The Court agrees. In determining whether parties are similarly situated, the Court looks to specific statistical data relating to the objective criteria for tenure, including education, experience, and number of published works as compared to others who had been granted tenure. *Lynn v. Regents of Univ. of California*, 656 F.2d 1337, 1342 (9th Cir. 1981). Because the tenure requirements that were applied to Dr. McCallum in 1999 were an older version than the revised requirements applied to Plaintiff, Dr. McCallum is not similarly situated to Plaintiff. *Id.* (holding that the "objective criteria for tenure" is a factor in determining whether applicants are similarly situated).

However, Dr. Brunell was granted tenure in 2007, under the same standards that were applied to Plaintiff's application. Furthermore, like Plaintiff, Dr. Brunell only published one paper during his employment at University of Pacific. (*See* Curriculum Vitae of Mark S. Brunell, ECF No. 96-1 at 33–37.) Thus, the Court agrees that Plaintiff has made a prima facie showing as to her qualifications for tenure and as to her claim of more favorable treatment for a similarly-situated male. Accordingly, the Court turns to Defendant's rebuttal arguments as to Plaintiff's assertion that she was improperly denied tenure.[2]

        **ii.**        **Defendant's Nondiscriminatory Reasons for Denying Tenure**

In response to Plaintiff's assertions, Defendant argues that the circumstances and/or qualifications of Dr. Brunell are distinguishable from Plaintiff's. Specifically, Defendant contends that Dr. Brunell's application was not similarly situated to Plaintiff because Dr. Brunell had been awarded numerous grants and that these grants distinguish his tenure application from Plaintiff's. (*See* Donald DeRosa Decl., ECF No. 67-4 at ¶ 77; ECF No. 96-1 at 34.) Defendant asserts that one publication is the bare minimum required of an applicant and further states that publication alone does not support granting tenure. (*See* President Donald DeRosa Dep. at

---

[2] Defendant contends that the Dr. Brunell's application was not similarly situated to Plaintiff because Dr. Brunell had been awarded numerous grants. The Court finds that this argument (which Defendant has provided both in support of its argument that Plaintiff cannot meet the prima facie requirement and also as nondiscriminatory rebuttal evidence) is more appropriately characterized as Defendant's nondiscriminatory reason for denying Plaintiff's tenure application. As such, the Court addresses Defendant's rebuttal argument in phase two of the analysis, pursuant to the *McDonnell Douglas* framework. *See McDonnell Douglas*, 411 U.S. at 802–804.

1   108:10–21.)  Instead, Defendant contends that it looks at the applicant's file as a whole, and that
2   an applicant who has the minimum publication requirements may overcome this deficiency if he
3   or she has been awarded grants.  (DeRosa Dep. at 102:09–23.)  The Court finds that Defendant's
4   proffered reason for denying Plaintiff tenure suffices as a viable nondiscriminatory reason for its
5   actions.  As such, the burden shifts to Plaintiff to show that the reasons garnished by Defendant
6   are pretextual.  *See St. Mary's Honor Ctr.*, 509 U.S. at 510–11.

### iii.  Plaintiff's Evidence of Pretext

8   Plaintiff's evidence of pretext implicates the individuals and the processes used in
9   Defendant's tenure evaluation process.  Consequently, the Court provides some background
10  information to assist in evaluating Plaintiff's assertions.

11  Defendant employs a tenure evaluation process requiring all applicants to first be
12  evaluated by a faculty committee.  (ECF No. 69-1 at 11.)     A copy of the faculty committee
13  evaluation report and recommendations are then sent to the dean, the applicant, and department
14  chair.  (ECF No. 69-1 at 11.)  The generated report is accessible to all faculty members that will
15  then vote on the whether to recommend tenure.  (ECF No. 69-1 at 11.)  The result of this vote is
16  reported to the applicant, the department chair, and the dean. (ECF No. 69-1 at 11.)  Pursuant to
17  the Chemistry Department's guidelines, the chair also submits a recommendation to the dean and
18  applicant.  (Dr. Elfi Kraka Dep., 41:06–13.)  Upon receipt of the evaluation report and the
19  recommendations, the dean also prepares a recommendation which is then added to the others and
20  submitted to the Provost for review by the Promotions and Tenure Committee.  (ECF No. 69-1 at
21  12.)   The Promotions and Tenure Committee will then provide its recommendation as to whether,
22  in its judgment, the standards for promotion and appointment with tenure have been satisfied.
23  (ECF No. 69-1 at 12–13.)   After receiving the recommendation, the Provost submits a
24  recommendation to the President with a copy of the Promotion and Tenure Committee's report.
25  (ECF No. 69-1 at 13.)  The President reviews all of the materials and decides whether in his or
26  her judgment, the standards for promotion and appointment with tenure have been satisfied.
27  (ECF No. 69-1 at 13.)

28  This protocol as applied to Plaintiff resulted in the following.  In October 2006, the

8

Department of Chemistry faculty committee issued an evaluation recommending Plaintiff be granted tenure. (Evaluation Committee's Report, ECF No. 89 at 15–23.) On October 23, 2006, the Department of Chemistry faculty voted in favor of tenure. (ECF No. 89 at 13–14.) Following the vote, Chemistry Chair Dr. Elfie Kraka wrote a letter to the Interim Dean, Dr. Robert Cox, in which she recommended Plaintiff for promotion and tenure. (ECF No. 69-14.) However, on November 13, 2006, Dr. Cox recommended against promotion and tenure of Plaintiff. (Letter from Dr. Cox to Members of the Promotions and Tenure Committee and Provost Gilbertson, ECF No. 69-15.) Subsequently, Dr. Cox had numerous exchanges during December of 2006 with both Dr. Kraka and her husband, Dr. Dieter Cremer, who was also a Professor in the Chemistry Department at University of Pacific, concerning Plaintiff's candidacy for tenure. (*See* Email Correspondence Between Dr. Cremer and Dr. Cox, ECF No. 69-18; Emails from Dr. Cox to Dr. Kraka, ECF No. 69-21.) On January 15, 2007, the University of Pacific Promotion and Tenure Committee voted to recommend promotion and tenure to Plaintiff. (Jose Fuentes Decl. Exhibits 18 and 19, ECF Nos. 92-3, 92-4.) However, on February 5, 2007, pursuant to the conversations between Dr. Kraka and Dr. Cox, Dr. Kraka changed her recommendation concerning Plaintiff's candidacy and ultimately recommended against Plaintiff's tenure application. (Memo to Provost Gilbertson from Dr. Kraka, ECF No. 69-21.) On April 15, 2007, Plaintiff was informed by Provost Philip N. Gilbertson that President Donald DeRosa did not approve her application for tenure. (Letter from Provost Gilbertson, ECF No. 69-22.)

In assessing Plaintiff's candidacy for tenure, President DeRosa reviewed a file containing Dr. Kraka's revised evaluation of Plaintiff, in which she recommended denying Plaintiff's application for tenure, as well as the November 13, 2007, letter that Dr. Cox wrote in which he also recommended denying Plaintiff's application. (DeRosa Decl., ECF No. 67-4 at ¶¶ 49–53.) In President DeRosa's declaration he "noted that the unit committee and the promotions and tenure committee conducted a vote in favor of tenure, but that the evidence, adjudged by [him], was in the form of a prediction that Plaintiff would eventually obtain evidence showing a sustained record of high quality scholarship, rather than providing [him] with persuasive evidence already in the record." (ECF No. 67-4 at ¶ 57.) However, President DeRosa's declaration also

9

references that Dr. Kraka's supplemental report concerning the status of Plaintiff's publications was instrumental in evaluating whether Plaintiff had shown a record of high quality scholarship:

> 50. The February 2007 supplemental report from Dr. Kraka that I reviewed in 2007 as part of the tenure file that I then reviewed, stated:
>
> "Dr. Hellman-Blumberg's second paper was turned down by several journals and had to be largely rewritten by its authors. I would have expected that all the papers that were already described in the committee reports for Dr. Hellman-Blumberg as being close to finished be now on the table because so much is at stake for the candidates. Nothing like this has happened." Ex. FF.
>
> 51. This fact that the two other papers were not published or accepted for publication indicated to me that there were serious questions about whether Plaintiff's current record of scholarship was high quality and sustained.

(ECF 67-4 at ¶ 50–51.) President DeRosa's declaration also references that he considered Dr. Cox's evaluation in making his determination. "The tenure application file that I reviewed in 2007 showed the written evaluation by Dean Cox, a long time University professor then serving on an interim basis and who I considered a person of high integrity and [sic] standards of scholarship." (ECF 67-4 at ¶ 52.)

Plaintiff asserts that the University's reasons for denying her tenure application are pretextual. More specifically, Plaintiff argues that Dr. Cox has a history of gender bias. (ECF No. 87 at 13, 18.) In support of her contention, Plaintiff offers the deposition testimony of Dr. Gregg Camfield. Dr. Camfield is a former colleague of Dr. Cox and also a former member of the promotions and tenure committee. In his deposition, when Dr. Camfield was asked whether he had ever stated that Bob Cox is biased against women faculty members who are in the English department, he answered "yes." (Dr. Gregg Camfield Dep., 104:17–21.) Dr. Camfield said that he had discussed this issue with another University of Pacific English Professor, Becky Beale. (Camfield Dep., 104:22–25.) Dr. Camfield testified to the following at his deposition:

> A. I was probably responding to [Becky Beale] because she was speaking -- she has often spoke of what she saw as gender bias in the university and I was confirming.
>
> Q. You were telling Becky that you believe that Professor Cox was

|   |   |
|---|---|
| 1 | gender biased? |
| 2 | A. Yes. |
| 3 | Q. Did you ever say that to anybody else? |
| 4 | A. Wow, I'm trying to think. Becky was my best confidant so I was very candid with her. I know that people in the English department often complained about what they saw as his sexism. And as I say, I tried to defend him. I tried to help him. I tried to support the department. So in those kinds of conversations I probably said, "Yes, but ... "a lot. That is to say, I probably said, "Well, that's very likely given his age and so forth, I don't think he's deliberately acting out of it. I think he's trying to do his best. I think this is an implicit bias," that kind of thing. |

(Camfield Dep., 105:02–21.)   Additionally, Plaintiff proffered evidence that in 2008, Dr. Cox recommended granting Dr. C. Gregory Anderson tenure in the Biology department even though Dr. Anderson had not published any papers during his employment at the University.  (*See* DeRosa Dep., 134:17–135:02.)[3]

The Court finds that Plaintiff has provided evidence in support of her assertion that Defendant's reasons for denying her tenure application are pretextual.  *See Lindahl v. Air France*, 930 F.2d 1434, 1439 (9th Cir. 1991) (holding that deposition testimony where a decisionmaker stated that he believed that female candidates get "nervous" and "get[ ] easily upset [and] lose[ ] control" is evidence of sex discrimination).  The evidence that Plaintiff provides concerning Dr. Cox creates a material issue of fact concerning whether or not he is biased against women and if he is biased, whether it affected Plaintiff's application.[4]  Thus, there is a material issue of fact as to whether Dr. Cox's evaluation of Plaintiff's application was based on her qualifications alone or influenced by a bias towards her gender.  Moreover, although President DeRosa states that he independently decided that Plaintiff did not meet the tenure requirements, his statement in his declaration–that Dr. Cox is "a person of high integrity"–reflects that President DeRosa strongly

---

[3] President DeRosa testified that he did not approve Dr. Anderson's application for tenure because he did not believe that Dr. Anderson demonstrated research at a level commensurate with a master's degree program.  He also testified that Anderson's failure to publish during his employment at University of the Pacific weighed heavily into deciding to deny his tenure application. (DeRosa Dep., 135:18–136:03.)

[4] Plaintiff also contends that Dr. Kraka was induced by Dr. Cox to change her evaluation pursuant to conversations concerning whether funds that would have been paid to Plaintiff could instead be used to fund her husband's position at the University.  (ECF No. 87 at 19.)  The evidence that Plaintiff provides for Dr. Kraka's alleged conflict of interest seems tenuous at best.

considered Dr. Cox's recommendation when making his determination.  *See Staub v. Proctor Hospital*, 131 S. Ct. 1186, 1192 (2011) ("[I]f a supervisor performs an act motivated by [] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable.").  As such, the Court hereby DENIES Defendant's summary judgment motion as it pertains to Plaintiff's gender discrimination claims.

### iv. Plaintiff's Fourth and Fifth Causes of Action

Defendant alleges that Plaintiff's Fourth Cause of Action for Breach of Contract and Fifth Cause of Action for breach of implied covenant of good faith and fair dealing are barred pursuant to California Code of Civil Procedure § 1094.5.  (ECF No. 70 at 24–25.)

Defendant has previously made these same arguments to this Court.  (*See* Def.'s Mot. for J. on the Pleadings, ECF No. 14.)  The Court reaffirms its previous decision and again hereby DENIES Defendant's motion.  (*See* Order Denying Def.'s Mot. for J. on the Pleadings, ECF No. 29).  The Ninth Circuit has consistently held that a "state cannot confer rights upon private parties and require that litigation between those parties must be confined to the courts of the state itself."  *BNSF Ry. Co. v. O'Dea*, 572 F.3d 785, 788 (9th Cir. 2009); *see also U.S. Fid. & Guar. Co. v. Lee Investments LLC*, 641 F.3d 1126, 1133 (9th Cir. 2011) ("[S]tate law may not control or limit the diversity jurisdiction of the federal courts.  The district court's diversity jurisdiction is a creature of federal law under Article III.").  As such, Defendant's motion for summary judgment as to Plaintiff's Fourth and Fifth Claims is DENIED.

## IV. CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment or in the Alternative Partial Summary Judgment (ECF No. 65) is hereby DENIED.

IT IS SO ORDERED.

Dated: March 13, 2014

Troy L. Nunley
United States District Judge

12